IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEW MEDIUM TECHNOLOGIES LLC, AV TECHNOLOGIES LLC, IP INNOVATION LLC, and TECHNOLOGY LICENSING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 05 C 5620 |
| BARCO N.V., MIRANDA TECHNOLOGIES, LG PHILIPS LCD, LTD., TOSHIBA CORPORATION, TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C., and SYNTAX-BRILLIAN CORPORATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants' Joint Motion to Dismiss or in the Alternative for Summary Judgment for Lack of Standing as to the '780, '637, and '964 Patents. For the following reasons, Defendants' motion is denied.

## BACKGROUND

New Medium Technologies, LLC, AV Technologies LLC, IP Innovation LLC ("IP"), and Technology Licensing Corporation ("TLC") have sued Barco N.V., Miranda Technologies ("Miranda"), LG Philips LCD, Ltd., Toshiba Corporation, Toshiba America Consumer Products, L.L.C., and Syntax-Brillian Corporation, alleging patent infringement. (R. 104-1, Third Am. Compl.) The suit alleges infringement of a total of eleven patents, but, with the exception of Barco (which is accused of infringing all eleven patents), only some of the patents are relevant to the claims involving any given plaintiff or defendant. All of the Defendants in this matter other than Miranda ("Defendants")

have moved to dismiss, or in the alternative, for summary judgment, for lack of standing as to three of patents: U.S. Pat. Nos. 5,424,780 ("the '780 patent); 6,529,637 ("the '637 patent); and 6,870,964 (the '964 patent). Defendants argue that IP's and TLC's ownership interest in the three patents at issue ("the three patents") is insufficient to provide them with standing to sue.

J. Carl Cooper is the sole inventor of all three of the patents. On March 3, 1995, Cooper assigned two patent applications that eventually issued as the '637 and '964 patents to Pixel. (R. 254-1.) The parties agree that as of March 22, 1999 – the date that certain parties executed an agreement on which much of Defendants' motion turns – Cooper held legal title to the '780 patent, and Pixel held legal title to the '637 and '964 patents.

On March 14, 1997, Cooper conveyed certain rights in the '780 patent to TLC. (R. 290-5, "the Cooper Agreement.") On that same day, Pixel conveyed rights in a number of patents to TLC. (R. 290-4, "the Pixel Agreement.") Through a "Patent Addition Confirmation" that Pixel and TLC executed in March 2003, the two parties confirmed that the '637 patent – as well as "any divisions, continuations, continuations in part, reissues and/or reexaminations thereof," which includes the '964 patent – is one of the "licensed patents" subject to the terms of the Pixel Agreement. (R. 290-4.) The parties dispute the legal effect of both of these transfers, which collectively cover all three of the relevant patents, and whether they conveyed "all substantial rights" in the patents to TLC or rendered TLC an exclusive licensee of the patents.

While Defendants claim that the Cooper and Pixel Agreements rendered TLC something less than an exclusive licensee or a holder of all substantial rights, the heart of their motion revolves around a later agreement. On March 22, 1999, TLC, Pixel, and Cooper, collectively as "Assignor," assigned to IP "an undivided ownership interest in and to all rights of Assignor" in the three patents.[1] (R. 240-1, Agreement dated Mar. 22, 1999, Ex. C to Joint Mot. to Dismiss or in the Alternative for Summ. J. ("the 1999 Agreement").) Defendants argue that the 1999 Agreement divided rights in the three patents such that all four entities involved are "co-owners" that must join in the suit to establish standing. They further argue that because the standing issue here is one of "constitutional" standing rather than "prudential" standing, TLC and IP cannot cure the standing deficiency by joining Cooper and Pixel as parties. As a result, Defendants argue that the Court must dismiss Plaintiffs' claims regarding the three patents. The Court disagrees.

## **LEGAL STANDARDS**

Standing to sue is a threshold jurisdictional requirement in every federal action. *Sicom Sys., Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 975 (Fed. Cir. 2005). Rule 12(b)(1) motions address standing issues, and federal courts "may not grant relief when standing does not exist." *Heartland Direct, Inc. v. Chevron U.S.A. Inc.,* No. 06 C 1029, 2006 WL 2524139 at *2 (N.D. Ill. Aug. 30, 2006). When considering a Rule 12(b)(1) motion challenging the factual basis for subject matter jurisdiction, district courts look beyond the pleadings and consider all competent evidence. *Id.; Hay v. Indiana State Bd. of Tax Comm'rs,* 312 F.3d 876, 879 (7th Cir. 2002).

---

[1] The 1999 Agreement covers all three patents because Schedule I to the agreement explicitly includes the '780 Patent and also includes two patent applications that matured into the '637 and '964 patents.

3

The party bringing the action bears the burden of establishing that it has standing to sue. *Sicom,* 427 F.3d at 976. "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." *Id.* § 100(d). Furthermore, if a patentee transfers "all substantial rights" under the patent, the transfer constitutes an assignment, and the assignee is deemed "the effective patentee . . . for purposes of holding constitutional standing to sue another for patent infringement in its own name." *Sicom,* 427 F.3d at 976.

Licensees that do not receive "all substantial rights" to a patent through a licensing agreement may still have standing to sue in some circumstances. "A party that is neither the legal owner of the patent nor the transferee of all substantial rights in the patent still has standing to sue for infringement if that party has a legally protected interest in the patent created by the Patent Act, so that it can be said to suffer legal injury from an act of infringement." *Propat,* 473 F.3d at 1193. Exclusive licensees, meaning those parties with "the exclusive right to make, use, or vend the invention," have this type of interest. *Id.* (quoting *Independent Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 469 (1926)). But "[u]nlike the patentee or the transferee of all substantial rights in the patent . . . an exclusive licensee ordinarily may not sue in its name alone, but must join the patent owner in an action brought against an accused infringer." *Propat,* 473 F.3d at 1193. The requirement that an exclusive licensee must ordinarily join the patent owner is a prudential requirement rather than a constitutional requirement based on Article III, and as a result, an exclusive licensee that initially brings its action alone may maintain its suit so long as the patent owner is joined in the course of the litigation.

4

*Id., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333, 1348-49 (Fed. Cir. 2001).

Unlike exclusive licensees, "bare licensees," or parties possessing only a covenant from the patentee that the patentee will not sue it for infringing patent rights, lack standing to sue third parties for patent infringement. *Propat,* 473 F.3d at 1193. Bare licensees cannot cure their lack of standing by joining the patentee as a party, and as a result, courts must dismiss infringement actions brought by bare licensees. *Id.* at 1193-94.

## **ANALYSIS**

This motion largely turns on the rights conveyed by the Cooper Agreement and the Pixel Agreement (collectively, "the 1997 Agreements"), as well as the 1999 Agreement. The Court examines each conveyance in turn.

### I. The 1997 Agreements

The two 1997 Agreements use substantively identical terms to convey patent rights from Pixel and Cooper to TLC. Defendants argue that TLC received only limited rights though the 1997 Agreements, but ultimately contend that the legal characterization of those rights is immaterial because the 1999 Agreement "superseded" the 1997 Agreements.[2] (R. 238-1, Mot. to Dismiss or for Summ. J. at 9.) To understand the landscape that existed as the parties entered into the 1999 Agreement, however, it is important to understand the rights Pixel and Cooper conveyed to TLC in 1997.

---

[2] On reply, Defendants state that they only claim that the 1999 Agreement superseded the 1997 Agreements to the extent they are inconsistent with each other (R. 334-1, Reply in Supp. of Mot. to Dismiss or for Summ. J. at 5-6), but Defendants' fundamental argument remains the same.

5

The 1997 Agreements each purport to convey "all of Licensor's substantial rights in and to the subject patents." (R. 290-4, 290-5, 1997 Agreements at 1.) While a transfer of patent rights under a given agreement depends "upon the legal effect of its provisions" rather than "the name by which it calls itself," *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.p.A.,* 944 F.2d 870, 875 (Fed. Cir. 1991) (quoting *Waterman v. Mackenzie,* 138 U.S. 252, 256 (1891)), the Court concludes that the 1997 Agreements did indeed convey all substantial rights in the relevant patents to TLC.

Courts look to a variety of factors to determine whether a licensing agreement provides a licensee with "all substantial rights" in a patent. These factors include: (1) whether the licensor has the power to bar the licensee from transferring its interest to a third party; (2) whether the licensor maintains an equity interest in the proceeds of licensing and litigation activities; (3) whether the licensor has a right to notice of licensing decisions, and, if so, the right to veto them; (4) whether the licensor has a right to notice of litigation decisions, and, if so, the right to veto them; (5) whether the licensor has the ability to terminate the licensing agreement in certain circumstances; and (6) whether the licensee or licensor bears the obligation to maintain the patent. *See Propat,* 473 F.3d at 1190-93.

Defendants point to three of the *Propat* factors that purportedly show that TLC did not receive all substantial rights in the three patents through the 1997 Agreements. Defendants first argue that the agreements limited TLC's ability to transfer their patent rights, a factor the Federal Circuit has identified as "particularly significant" in the all substantial rights analysis. *See Propat,* 473 F.3d at 1191. Defendants' argument is based on Paragraph 12.3 of the 1997 Agreements, which states that TLC may only transfer

"[t]his Agreement . . . . to the extent that it is made in conjunction with a disposition of substantially all of [TLC]'s business involving the Licensed Products." (R. 290-4, 290-5, 1997 Agreements ¶ 12.3.) Their reliance on this provision is misplaced. Paragraph 12.3 relates to transfer of the Agreements themselves, and the obligations they create, rather than to transfer of patent rights. As far as the actual patent rights are concerned, the 1997 Agreements give TLC "the right to further assign, transfer, or sublicense or otherwise provide any or all of the above rights to any other entities, providing however that such other entity agrees to be bound by this agreement with respect to the considerations granted Licensor." (*Id.* ¶ 2.1.) The only limitation on transfer, therefore, is that any party to which TLC transfers its rights must agree to provide consideration to Pixel and Cooper as provided by the 1997 Agreements. The Federal Circuit has held that a limitation on transfer protecting an assignee's consideration and royalty stream "does not significantly restrict" the licensee's rights in the patent. *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1251-52 (Fed. Cir. 2000). As a result, the "ability to transfer rights" factor does not support Defendants' view that TLC did not receive "all substantial rights" in the relevant patents.

Second, Defendants claim that the way in which the 1997 Agreements provide for maintenance of the relevant patents weighs against a finding that they provided TLC with "all substantial rights." In *Propat,* the Federal Circuit stated that "[t]he responsibility to maintain a patent is one of the obligations that has been recognized by this court as an indication that the party with that obligation has retained an ownership interest in the patent." 473 F.3d at 1191. The 1997 Agreements state that "Licensor may if it so wishes but shall have no obligation hereunder, to proceed with the . . . maintenance . . . of any

licensed patent." (R. 290-4, 290-5, 1997 Agreements ¶ 7.2.) While the agreements allow Pixel and Cooper to maintain the patents if they so choose, the test under *Propat* examines which party has the ultimate "responsibility" to do so. The 1997 Agreements provide that the ultimate obligation to maintain the patent lies with TLC. This factor also therefore fails to diminish the rights the 1997 Agreements provided to TLC.

Finally, Defendants note that the 1997 Agreements require that TLC pay Cooper and Pixel a substantial portion of the proceeds of TLC's sublicensing and litigation activities. While Cooper's and Pixel's maintenance of an equity interest in the patents is relevant to determining whether the 1997 Agreements conveyed "all substantial rights," *Propat* indicates that this is not a particularly important consideration, as "the fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent . . . does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent." 473 F.3d at 1191; *see also Vaupel,* 944 F.2d at 875 ("the right to receive infringement damages was merely a means of compensation under the agreement; this was not inconsistent with an assignment"). Given that Defendants have otherwise failed to show that the 1997 Agreements did not convey all substantial rights in the patents to TLC, this factor alone will not warrant that conclusion.

Defendants' *Propat* factors amount to at most a minor limitation on TLC's rights under the 1997 Agreements, and they largely indicate that TLC received all substantial rights in the three patents. The other *Propat* factors further support this finding. Importantly, the terms of the 1997 Agreements provided TLC with the absolute right to sublicense the relevant patents (R. 290-4, 290-5, 1997 Agreements ¶ 2.2) and the

8

absolute right to bring an infringement action on the patents. (*Id.* ¶ 2.3.) Furthermore, the Agreements provide TLC with the right to practice the patents, and specifically with "an exclusive License under the Licensed Patents, including but not limited to the worldwide, exclusive rights to the inventions of the Licensed Patents, including the right to make, have made, sell, use, lease, or otherwise deal in Licensed Products on which a royalty has been paid as provided hereunder . . . ." (*Id.* ¶ 2.1.) In the final analysis, the 1997 Agreements provided TLC with the rights discussed in *Propat* as those that render a party the holder of "all substantial rights" in a patent.[3]

## II. The 1999 Agreement

Defendants' argument that TLC and IP do not have standing to sue is based largely on their view that the 1999 Agreement rendered TLC, IP, Pixel and Cooper "co-owners" as that term is used in *Israel Bio-Eng'g Project v. Amgen Inc.,* 475 F.3d 1256 (7th Cir. 2007) ("*IBEP*"). In *IBEP,* the Federal Circuit held that "[w]here one co-owner possesses an undivided part of the entire patent, that joint owner must join all of the other co-owners to establish standing." *Id.* at 1264.

As discussed above, when the parties entered into the 1999 Agreement, TLC held all substantial rights in the three patents as a result of the 1997 Agreements. "Even if the patentee does not transfer formal legal title, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights in the patent to the transferee." *Propat,* 473 F.3d at 1189. As a result, when the parties entered into the 1999 Agreement, TLC owned the three patents for standing purposes. Pixel and Cooper,

---

[3] While the Court does not necessarily adopt its reasoning, another district court has also concluded that the 1997 Agreement between Cooper and TLC provided TLC with all substantial rights in the patents involved. *See Technology Licensing Corp. v. Videotek, Inc.,* No. C01-04204-CRB, 2003 WL 21939756 (N.D. Cal. June 3, 2003).

9

having transferred all substantial rights in the patents to TLC, essentially held only bare legal title in the three patents at the beginning of March 1999. *See Sicom,* 427 F.3d at 976 (if a patentee "transfers all substantial rights under [a] patent, it amounts to an assignment and the assignee may be deemed the effective patentee . . . for purposes of holding constitutional standing to sue another for patent infringement in its own name").

Defendants correctly assert that the 1999 Agreements rendered IP a co-owner of rights in the three patents. As discussed above, as a general matter, the name an agreement uses to describe a certain transfer of a right or interest in a patent is not dispositive of the rights the agreement actually conveys. *See Vaupel,* 944 F.2d at 875. As a result, mere use of the term "exclusive license" in an agreement does not establish that it is indeed an exclusive license; courts must look instead to the rights conveyed by the agreement to determine if it is indeed what it claims to be. *See id.* The Federal Circuit also noted in *Vaupel*, however, that "the term 'assignment' has a particular meaning in patent law, implying formal transfer of title." *Id.*

The first paragraph of the 1999 Agreement is entitled "Assignment," and states: "Assignor shall and hereby does assign, convey, transfer, and sell to Assignee an undivided ownership interest in and to the Patent,[4] including without limitation, an undivided ownership interest in and to all rights of Assignor under all agreements assigning ownership of the of the Patent from the inventors and prior owners to the Assignor . . . ." (R. 240-1, 1999 Agreement ¶ 1.) The "Assignor" in the 1999 Agreement consists of three entities – Pixel and Cooper, who hold legal title to the patents, and TLC, the owner of the patents for purposes of asserting standing. The "Assignee" is IP. Patent

---

[4] The 1999 Agreement uses "the Patent" to refer collectively to the '780 patent as well as the patent applications that eventually became the '637 and '964 patents. In the context of the 1999 Agreement, "the Patent" thus refers to all three patents at issue here.

10

owners may assign or transfer their ownership interests in a patent as personal property, 35 U.S.C. § 261, and "[u]nder long established law, a patentee or his assignee may grant and convey to another . . . an undivided part or share of [its] exclusive [patent] right." *IBEP,* 475 F.3d at 1264 (citing *Vaupel,* 944 F.2d at 873; *Waterman v. Mackenzie,* 138 U.S. 252, 255 (1891)). That is precisely what has happened here. The 1999 Agreement by its terms assigns an "undivided ownership interest" to IP, and the portion of the Agreement related to "Rights of the Parties as Co-Owners" shows that the Assignee and Assignor hold the same rights in the three patents. (R. 240-1, 1999 Agreement ¶ 3.)

While Defendants generally acknowledge IP's co-owner status, they at one point question whether the 1999 Agreement rendered IP a "true co-owner" of the patents given that some of the rights it holds following the 1999 Agreement are not typical of the default rights held by co-owners, "including the right to act independently." (R. 238-1, Joint Mot. to Dismiss or for Summ. J. at 12.) It is true that the 1999 Agreements restrict the ability of IP to engage in certain activities – such as a transfer or license of its rights – without TLC's consent. (*See* R. 240-1, 1999 Agreement ¶ 3.) As Defendants themselves acknowledge, however, the default rights of co-ownership only apply "in the absence of an agreement to the contrary." *See, e.g., Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1468 (Fed. Cir. 1998); 35 U.S.C. § 262. Here, the parties entered into an agreement that both granted IP an ownership interest, as discussed above, and then modified some of the rights typically associated with co-ownership. This does not alter IP's status as a co-owner.

While Defendants correctly categorize IP as a "co-owner" of rights in the three patents following the 1999 Agreement, their broader argument that the 1999 Agreement rendered all four parties to the agreement co-owners fails. Defendants claim that because TLC, IP, Pixel, and Cooper are all "parties" to the 1999 Agreement – TLC, Pixel, and Cooper as "Assignor," and IP as "Assignee" – and because the agreement establishes the "Rights of the Parties as Co-Owners" (R. 240-1, 1999 Agreement ¶ 3), all four of the "parties" are, as a legal matter, "co-owners."

Defendants' argument fails. Following their grant of all substantial rights to TLC through the 1997 Agreements, Pixel and Cooper held nothing but the bare title in the three patents. The 1999 Agreement did nothing to enhance Pixel's and Cooper's rights given that the "flow" of patent rights in the agreement is from the Assignor (TLC, Pixel, and Cooper) to IP as Assignee. In return, TLC, Pixel and Cooper collectively received monetary compensation (R. 240-1, 1999 Agreement ¶ 2), but they did not receive any further rights in the patents.

The 1999 Agreement's reference to the "Rights of the Parties as Co-Owners" and statement that the "parties shall have the following rights as co-owners of the Patent" does not suggest otherwise. Nowhere does the agreement suggest that there are four parties to the agreement. Instead, the agreement consistently refers to the rights of "either party" or the rights of "neither party" to the agreement, clearly indicating that there are two "parties" to the agreement – Assignee (composed of three entities) and Assignor. Describing the Assignee collectively as a co-owner is accurate given that Pixel and Cooper held bare title in various patents and TLC had all substantial rights in all three. It is inaccurate, however, to refer to all three of the Assignee entities individually

as "co-owners." Following the 1997 Agreements' grant of all substantial rights in the three patents to TLC, only TLC owned the patent rights for standing purposes. *See Propat,* 473 F.3d at 1189.

The end result is that TLC and IP are the co-owners of all rights in the three patents. As discussed above, under *IBEP,* all co-owners of a patent must join in a lawsuit to establish standing. That is precisely what TLC and IP have done in this case, and as a result, they have standing to sue on the three patents, with no need to join Cooper and Pixel.

## **CONCLUSION**

For the foregoing reasons, Defendants' Joint Motion to Dismiss or in the Alternative for Summary Judgment for Lack of Standing as to the '780, '637, and '964 Patents is denied.

Dated: July 2, 2007

**ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**