IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NEW MEDIUM TECHNOLOGIES LLC,    )
AV TECHNOLOGIES LLC, IP         )
INNOVATION LLC, and TECHNOLOGY  )
LICENSING CORPORATION,          )
                                )
            Plaintiffs,         )
                                )
v.                              )        05 C 5620
                                )
BARCO N.V., MIRANDA             )
TECHNOLOGIES, LG PHILIPS LCD,   )
LTD., TOSHIBA CORPORATION,      )
TOSHIBA AMERICA CONSUMER        )
PRODUCTS, L.L.C., and SYNTAX-   )
BRILLIAN CORPORATION,           )
                                )
            Defendants.         )

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is Miranda and Barco N.V.'s Joint Motion Under Fed. R. Civ. P.
12(b)(1) to Dismiss for Lack of Standing. For the following reasons, the Court declines
to dismiss Plaintiffs' claims on the patents at issue. Plaintiffs are instructed, however, to
join J. Carl Cooper and Pixel Instruments as plaintiffs in order to establish standing to
sue.

**BACKGROUND**

New Medium Technologies, LLC ("New Medium"), AV Technologies LLC
("AV"), IP Innovation LLC, and Technology Licensing Corporation ("TLC") have sued
Barco N.V. ("Barco"), Miranda Technologies ("Miranda"), LG Philips LCD, Ltd.,
Toshiba Corporation, Toshiba America Consumer Products, L.L.C., and Syntax-Brillian
Corporation, alleging patent infringement. (R. 104-1, Third Am. Compl.) The suit
alleges infringement of a total of eleven patents, but, with the exception of Barco (which

is accused of infringing all eleven patents), only some of the patents are relevant to the claims involving any given plaintiff or defendant. Defendants Miranda and Barco allege that Plaintiffs lack standing as to eight of the patents, six of which are at issue in New Medium's infringement claims ('594, '049, '057, '707, '741, and '869) and two of which are relevant to AV's claims of infringement ('070 and '547).

On February 26, 2007, Barco filed a Motion to Dismiss for Lack of Standing as to the '070 Patent, claiming that AV did not have standing to sue on the '070 patent because (1) AV's license on the patent was executed after the '070 patent expired, rendering it a "legal nullity"; and (2) the license did not support standing because it did not transfer "all substantial rights" under the '070 patent to AV. (R. 217-1.) On March 9, 2007, Barco and Miranda filed the motion currently before the Court, which incorporated the arguments in the February 26 motion and further asserted the "all substantial rights" standing argument as to the '594, '049, '057, '707, '741, '869, and '547 patents. (R. 230-1.) On April 26, 2007, the Court denied the February 26 motion as moot because it seeks the same relief requested in the March 9 motion, and on the same grounds. (R. 342-1.) The Court also made clear that it will consider the arguments raised in the February 26 motion when ruling on the motion now before the Court. (*Id.*)

The motion turns on the nature and extent of the rights granted to New Medium and AV (collectively, "Plaintiffs") under two licensing agreements ("the Agreements") that conveyed to Plaintiffs their interest in the relevant patents. In one Agreement, TLC, Pixel Instruments Corporation ("Pixel"), and J. Carl Cooper (collectively, "the Licensors") granted AV certain rights in the '070 and '547 patents. (R. 289-9.) In the other Agreement ("the New Medium Agreement"), the Licensors granted New Medium

certain rights in the '594, '049, '057, '707, '741, and '869 patents. (R. 289-10.) The relevant provisions of the Agreements, each of which was executed on November 12, 2004, are identical and are discussed at length below.

## LEGAL STANDARDS

Standing to sue is a threshold jurisdictional requirement in every federal action. *Sicom Sys., Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 975 (Fed. Cir. 2005). Rule 12(b)(1) motions address standing issues, and federal courts "may not grant relief when standing does not exist." *Heartland Direct, Inc. v. Chevron U.S.A. Inc.,* No. 06 C 1029, 2006 WL 2524139 at *2 (N.D. Ill. Aug. 30, 2006). When considering a Rule 12(b)(1) motion challenging the factual basis for subject matter jurisdiction, district courts look beyond the pleadings and consider all competent evidence. *Id.; Hay v. Indiana State Bd. of Tax Comm'rs,* 312 F.3d 876, 879 (7th Cir. 2002).

The party bringing the action bears the burden of establishing that it has standing to sue. *Sicom,* 427 F.3d at 976. "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." *Id.* § 100(d). Furthermore, if a patentee transfers "all substantial rights" under the patent, the transfer constitutes an assignment, and the assignee is deemed "the effective patentee . . . for purposes of holding constitutional standing to sue another for patent infringement in its own name." *Sicom,* 427 F.3d at 976.

Courts look to a variety of factors to determine whether a licensing agreement provides a licensee with "all substantial rights" in a patent. These factors include: (1) whether the licensor has the power to bar the licensee from transferring its interest to a

third party; (2) whether the licensor maintains an equity interest in the proceeds of licensing and litigation activities; (3) whether the licensor has a right to notice of licensing decisions, and, if so, the right to veto them; (4) whether the licensor has a right to notice of litigation decisions, and, if so, the right to veto them; (5) whether the licensor has the ability to terminate the licensing agreement in certain circumstances; and (6) whether the licensee or licensor bears the obligation to maintain the patent. *See Propat Int'l Corp. v. RPost, Inc.,* 473 F.3d 1187, 1190-93 (Fed. Cir. 2007). The ability to transfer patent rights is "particularly significant" within the "all substantial rights" analysis, and the Federal Circuit has gone so far as to refer to a restraint on transferability as "'fatal' to the argument that the agreement transferred all substantial rights in the patent." *Id.* at 1191 (quoting *Sicom,* 427 F.3d at 979).

Licensees that do not receive "all substantial rights" to a patent through a licensing agreement may still have standing to sue in some circumstances. "A party that is neither the legal owner of the patent nor the transferee of all substantial rights in the patent still has standing to sue for infringement if that party has a legally protected interest in the patent created by the Patent Act, so that it can be said to suffer legal injury from an act of infringement." *Propat,* 473 F.3d at 1193. Exclusive licensees, meaning those parties with "the exclusive right to make, use, or vend the invention," have this type of interest. *Id.* (quoting *Independent Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 469 (1926)). But "[u]nlike the patentee or the transferee of all substantial rights in the patent . . . an exclusive licensee ordinarily may not sue in its name alone, but must join the patent owner in an action brought against an accused infringer." *Propat,* 473 F.3d at 1193. The requirement that an exclusive licensee must ordinarily join the

4

patent owner is a prudential requirement rather than a constitutional requirement based on Article III, and as a result, an exclusive licensee that initially brings its action alone may maintain its suit so long as the patent owner is joined in the course of the litigation. *Id., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333, 1348-49 (Fed. Cir. 2001).

Unlike exclusive licensees, "bare licensees," or parties possessing only a covenant from the patentee that the patentee will not sue it for infringing patent rights, lack standing to sue third parties for patent infringement. *Propat,* 473 F.3d at 1193. Bare licensees cannot cure their lack of standing by joining the patentee as a party, and as a result, courts must dismiss infringement actions brought by bare licensees. *Id.* at 1193-94.

Some cases, such as those in which the relevant licensing agreement indicates that the parties contemplated that the licensee would engage only in licensing and litigation activities (and not practice of the patent) do not fit neatly into the "exclusive licensee versus bare licensee" distinction that often drives the outcome of a patent standing dispute. *See id.,* 473 F.3d at 1194. In these situations, courts look to the same factors that inform the "all substantial rights" analysis – including the rights to sue infringers, license the patent, and transfer the patent without excessive interference from the licensor – to see whether the rights afforded by the license agreement provide a plaintiff with standing to sue in their own name. *See id.*

<u>**ANALYSIS**</u>

The parties' arguments and the Federal Circuit's legal framework raise three key questions in this case. First, did New Medium and AV receive "all substantial rights" in the patents such that they may sue for infringement without joining the licensors? Second, if the answer to that question is "no," did New Medium and AV receive the right to practice the patents such that they are "exclusive licensees" entitled to sue for infringement so long as they join the patentee? And finally, if the answer to that question is also "no," do the rights afforded by the Agreements render New Medium and AV the equivalent of exclusive licensees who may sue if the licensor is joined, or the equivalent of "bare licensees" that have no right to sue for infringement regardless of joinder?

## I.     All Substantial Rights

If the Agreements grant all substantial rights in the patents to Plaintiffs, they have standing to sue without joining the Licensors. The Court first turns to this question.

### A.      Transfer of Rights

As discussed above, the Federal Circuit has indicated that the ability of a licensee to transfer its patent rights is "particularly significant" in the all substantial rights analysis. *See Propat,* 473 F.3d at 1191.

Each Agreement at issue states:

> No party may . . . transfer, convey or assign its interest in the Patents except (i) to an affiliate that agrees to be bound by the terms of this Agreement or (ii) to a third party that agrees to be bound by the terms of this Agreement, but only after offering it to the non-transferring party under this Agreement for a price equal to the lesser of the bona fide offer by the third party or $50,000; provided that in no event may either party transfer its interest in the Patents to an entity that infringes or may infringe the Patents without the written consent of the other party.

(R. 289-9, 289-10, Agreements ¶ 3(D).)  The Agreements thus contain three limitations on the right to transfer: (1) New Medium and AV may only transfer their interests to parties that agree to be bound by the terms of the Agreement; (2) New Medium and AV may only transfer their interests to unrelated parties after the licensors have declined to exercise their right of first refusal, which allows the Licensors to purchase the interests for the amount of the bona fide offer or $50,000, whichever is less; and (3) New Medium and AV are restricted from transferring their interests to an entity that "infringes or may infringe" the Patents without the Licensors' written consent.

Defendants argue that these restrictions most closely parallel those at issue in *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128, 1132 (Fed. Cir. 1995), in which the court held that the licensor's right to prevent assignment of rights to any party other than a successor in interest was "the sort [of retained right] commonly held sufficient to make a patent owner who grants an exclusive license a necessary party to an infringement action brought by the licensee."  Plaintiffs argue that this case is similar to *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1251 (Fed. Cir. 2000), which involved an agreement that required the licensor's consent to any assignment, but that also stated that consent to an assignment "shall not be withheld unreasonably."  The *Speedplay* court found that this term distinguished its agreement from that in *Abbott.  See id.* at 1251-52.

This facts of this case fall in between *Abbott* and *Speedplay.*  The Agreement contains two significant limitations on Plaintiffs' ability to transfer their patent rights.  First, the Licensors have the absolute ability – unconstrained by any "reasonableness" restriction – to prevent Plaintiffs from transferring their rights to a party that "infringes or may infringe" the patent.  The restriction on transfer to a vague and potentially expansive

7

group of parties that "may infringe" limits Plaintiffs' ability to transfer their interest, at least without fear of litigation. Even when limited to the universe of actual infringers, this term eliminates Plaintiffs' ability to resolve infringement disputes through a transfer of patent rights. The Licensors' unfettered ability to prevent transfer to this group of potential transaction partners amounts to a significant limitation on Plaintiffs' ability to transfer their patent rights.

Second, the "right of first refusal" term further restricts Plaintiffs' ability to freely transfer their rights. If Plaintiffs receive an offer for their "bundle" of patent rights, this term allows the Licensors to buy back the rights they conveyed to Plaintiffs for as little as the amount of the offer received by Plaintiffs, and in any event, for no more than $50,000. While the parties have not submitted evidence regarding the approximate value of the rights the Agreements provided to Plaintiffs, this provision gives the Licensors the absolute ability to prevent transfer of Plaintiffs' rights to third parties. The likelihood of this term foreclosing transfer is particularly high if the value of the rights exceeds $50,000. In that case, Plaintiffs would not have any incentive to negotiate with third parties for the sale of their rights, because after expending the resources to do so, the Agreements would force them to offer the rights to the Licensors for less than market value. For these reasons, this provision also significantly limits the rights conveyed to Plaintiffs under the Agreements.

Because the Agreements do not permit the Licensors to prevent transfer without incurring costs in some cases, the restriction on transferability here is not as severe as that in *Abbott* or *Propat.* Licensors are still able, however, to prevent each and every transfer to any third party that Plaintiffs might propose, and they would have a powerful

incentive to do so in some situations.  Given the weight that the Federal Circuit affords

this factor, the restrictions on Plaintiffs' ability to transfer their patent rights weigh

heavily against their position.

> B.  **Equity Interest in Proceeds of Licensing and Litigation**

The next relevant consideration is Licensors' retention of an equity interest in the

proceeds of licensing and litigation activities.  Plaintiffs incorrectly argue that this issue

is a "red herring" on the basis that case law from the Federal Circuit "recognizes that a

right to a portion of [patent] proceeds does not defeat a transfer of 'all substantial rights'

in an exclusive license."  (R. 289-1, Opp. to Mot. to Dismiss at 13.)  Although *Propat*

states that retention of a right to a portion of the proceeds from exploitation of a patent

"does not *necessarily* defeat what would otherwise be a transfer of all substantial rights

in the patent," 473 F.3d at 1191 (emphasis added), it does not hold that retention of

equity rights is not a relevant consideration at all.  Instead, it demonstrates that courts

should consider this factor in an "all substantial rights" analysis.

Here, the Agreements provide that Plaintiffs must give the Licensors a majority of

the "Net Patent Revenues" they receive from any award, settlement, or license.  The

Agreements define "Net Patent Revenues" as funds received with respect to or in

consideration for any license, settlement or other interest in the Patents, less various

"Patent Costs" and attorney's fees.  Depending on the circumstances surrounding the

relevant award, settlement, or license, the Agreements provide for payment of anywhere

from 60% to 72.5% of Net Patent Revenues to the Licensors. (R. 289-9, 289-10,

Agreements ¶ 4.)  The Licensors' retention of a substantial majority of patent proceeds is

9

consistent with their retention of ownership rights in the patent. *See Propat,* 473 F.3d at 1191.

C.    **Rights Regarding Licensing Decisions**

The next relevant consideration is whether the licensor has a right to notice of licensing decisions, and, if so, the right to veto these decisions. "A licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights." *Prima Tek II, LLC v. A-Roo Co.,* 222 F.3d 1372, 1380 (Fed. Cir. 2000). The exact significance of this factor, however, remains unclear. While the Federal Circuit has called a licensor's ability to veto a sub-license "only a minor derogation from the grant of rights," *id.* at 1380, it has also characterized a requirement that a licensee notify a licensor of and obtain consent for licensing decisions as "the sort [of obligation] typically associated with the retention of an ownership interest in the patent." *Propat,* 473 F.3d at 1191.

Here, while the Licensors' ability to prevent sub-licensing falls well short of the full veto in *Propat*, the Agreements still impose limits on Plaintiffs' ability to sub-license their rights. First, Plaintiffs must "consult with" the Licensors, and "keep [them] advised" of "all licensing . . . action." (R. 289-9, 289-10, Agreements ¶ 3(E).) Second, and more significantly, the Licensors have the ability to veto efforts by Plaintiffs to "license or sublicense or grant other rights to a company to make, use or sell Components, including without limitation integrated circuits sold in the commodity market," where "Components" refers to "software, firmware, designs for use in ASICS, integrated circuits, or other parts, components or subassemblies of products, whether sold separately or manufactured by a company for inclusion in its own products." (*Id.* ¶

10

3(A).)  Plaintiffs stress the provision that follows – which allows Plaintiffs to "grant licenses, sublicenses, or other rights to companies with respect to products that incorporate such Components" – but the effect of this provision is limited by Plaintiffs' inability to unilaterally grant sublicenses for Components "manufactured by a company for inclusion in its own products."  (*See id.*)  The Agreements' sublicensing term constitutes an obstacle to Plaintiffs' ability to independently sublicense their rights – in the words of Defendants, it essentially "precludes the licensees from granting sublicenses on the actual patented inventions [without the Licensor's consent]." (R. 232-1, Mem. in Supp. of Mot. to Dismiss at 8.)  As a result, this sublicensing factor provides another example of the Agreements' failure to convey all substantial rights to Plaintiffs.[1]

D.    **Rights Regarding Litigation Decisions**

The next relevant factor is whether the licensor has a right to notice of litigation decisions, and, if so, the right to veto such decisions.  The Agreements provide that Plaintiffs may, "in [their] own name and without joinder or consent of Licensor, bring or maintain any action to enforce or protect the Patents . . . ."  (R. 289-9, 289-10, Agreements ¶ 3(B).)  In previous cases, the Federal Circuit has stressed that a license's conveyance of the right to sue is relevant to the all substantial rights analysis, going so far in one case as to call it, in a somewhat odd turn of phrase, "particularly dispositive." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.p.A.,* 944 F.2d 870, 875 (Fed. Cir. 1991).  The *Vaupel* court ultimately noted, however, that the "all substantial rights"

---

[1] The parties, and Plaintiffs in particular, exert a fair amount of energy discussing the way in which the products at issue in this case fit into the Agreements' general prohibition on the ability to sublicense the right to make, use, or sell Components.  As Defendants point out in their reply brief, the substance of the rights conveyed by the Agreements generally, and not the way in which they might apply to the parties and facts of the present litigation, is the appropriate focus of an "all substantial rights" analysis. *See Sicom,* 427 F.3d at 979.

11

inquiry more broadly is determinative.  *See id.* at 876 ("The contractual documents constituted a transfer of all substantial rights under the patent, thereby permitting [plaintiff] to sue; the agreements expressly granted [plaintiff] the sole right to sue for all infringements, past, present, and future as well.").  In later cases, the Federal Circuit has recognized that litigation-related contractual provisions are just one of many factors in the all substantial rights analysis, and that conclusory terms regarding standing have no impact at all.  *See, e.g., Prima Tek II,* 222 F.3d at 1381 ("Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue . . . ."); *Textile Prods., Inc. v. Mead Corp.,* 134 F.3d 1481, 1485 (Fed. Cir. 1998) ("A 'right to sue' provision within a license cannot, of its own force, confer standing on a bare licensee."). Indeed, the Agreements themselves reflect these legal principles, recognizing that Plaintiffs might not be able to bring suit on their own when they state that if the licensee "determine[s] in its reasonable judgment that Licensor is an indispensable party to any such action or proceeding, then it may bring any such action or proceeding in the name of Licensor and Licensor does hereby irrevocably make, constitute and appoint Licensee as its true and lawful attorney . . . ."  (R. 289-9, 289-10, Agreements ¶ 3(B).)

    The Agreements provide Plaintiffs with broad rights to bring suit in their own name, and further provide that "the final determination as to the terms of any license or settlement shall be made by Licensee."  (*Id.* ¶ 3(E).)  They also, however, contain significant limitations on Plaintiffs' litigation-related rights.  Plaintiffs for example must "consult with Licensor, and keep it advised, of all . . . enforcement action taken by Licensee."  (*Id.*)  While this is not an overwhelming restraint on Plaintiffs' ability to

12

direct litigation, use of the word "consult" – rather than a term carrying fewer obligations, such as "inform" – suggests that the parties envisioned that the Licensors would maintain an active role in any litigation. This mandatory "consultation" goes beyond the "notification" requirement that the *Propat* court found to be a relevant restraint in the all substantial rights analysis. *See Propat,* 473 F.3d at 1191.

Furthermore, with respect to certain administrative proceedings, the Licensors retained substantial rights. The Agreements state that "[i]f there is any proceeding before the U.S. Patent Office or any foreign patent office with respect to the Patents, including any reexamination or continuing or divisional application, Licensor and Licensee will jointly prosecute or pursue such proceeding, and all major decisions related thereto shall be made with their mutual consent." (R. 289-9, 289-10, Agreements ¶ 3(C).) The result is that Plaintiffs are merely equal partners with Licensors when it comes to pursuit of matters critical to the scope of the patent rights.

The payment of fees and costs related to administrative proceedings is also relevant to an all substantial rights analysis. Under the Agreements, Plaintiffs are obligated "to pay for all fees and costs . . . in any proceeding brought by Licensee under the Patents. Licensee shall be responsible for and pay any fees and costs, incurred after the date of this Agreement, in connection with any proceeding before the U.S. Patent Office or any foreign patent office relating to the Patents . . . ." (*Id.* ¶ 7.) While liability for fees and costs is a minor incident of ownership when compared to the Licensors' retention of the ability to direct significant administrative proceedings, *Propat* identified liability for maintenance fees as "an indication that the party with that obligation has retained an ownership interest in the patent." 473 F.3d at 1191. This consideration

therefore supports Plaintiffs' view regarding the patent rights they received through the Agreements.

### E. Compiling the "All Substantial Rights" Factors

The Agreements did not provide Plaintiffs with "all substantial rights" in the relevant patents. The limitations on Plaintiffs' ability to transfer alone – as a result of both the restriction on transfer to parties who "infringe or may infringe" as well as the Licensors' right of first refusal – demonstrate that Plaintiffs lack "all substantial rights." *See Sicom,* 427 F.3d at 979 (absolute inability of licensee to assign rights is "fatal" to their standing to bring suit on patents). While the constraint on transfer here is not quite as severe as that in *Abbott, Propat,* or *Sicom* in that the Licensors must incur some costs to prevent some transfers to third parties, the Licensors have the absolute ability to prevent all transfers of Plaintiffs' patent rights – for no more than the price the third party was willing to pay for the rights – and Plaintiffs are therefore subject to their whim.

This restriction on the right to transfer is not the only limitation on Plaintiffs' substantial rights in the patents. Plaintiffs can make licensing and litigation decisions only after "consulting" with the Licensors. Licensors have the ability to veto sublicenses to those who make, use, or sell Components incorporating the patents, or, to borrow Defendants' phrase, to those who make, use, or sell "the actual patented inventions." (R. 232-1, Mem. in Supp. of Mot. to Dismiss at 8.) And while the Agreements generally provide Plaintiffs with the right to select targets for suit, their litigation rights are constrained by the Agreements. Plaintiffs' rights regarding administrative proceedings – proceedings that can profoundly affect the scope and even the existence of the patent

rights – are constrained by the Licensors' retention of the right to jointly prosecute any proceeding before the United States Patent Office or any foreign patent office.

## II.        Exclusive Licensee Status – Right to Practice

If Plaintiffs can show that they are exclusive licensees of the patents, then they have a legally protected interest in the patents sufficient to confer standing.  The parties vigorously dispute whether the Agreements convey to New Medium and AV the right to practice the patents, and whether Plaintiffs qualify as exclusive licensees as a result.  The portion of the Agreements entitled "Exclusive License" grants Plaintiffs a "worldwide, perpetual and non-revocable exclusive license under the Patents including, without limitation, all rights, including all of the substantial rights, of Licensor and Previous Owners under the Patents in all fields of use . . . ."  (R. 289-9, 289-10, Agreements ¶ 1.) Mere use of the terms "all substantial rights" and "exclusive license" does not establish that the Agreements gave Plaintiffs the right to practice the patents.  Indeed, the use of certain legal terms in an agreement "is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination."  *Intellectual Prop. Dev.,* 248 F.3d at 1344; *see also Vaupel,* 944 F.2d at 875 ("[T]he use of the term 'exclusive licensee' in the [relevant agreement] is not dispositive; what the documents in fact recite is dispositive.").

Plaintiffs' argument relies on the Agreements' use of the word "license," and on a (non-legal) dictionary definition of that term.  The specific entry they cite in *The New Shorter Oxford English Dictionary on Historical Principles*, *Vol. I* 1578 (4th ed. 1993) defines "license" as "[to] [g]rant (a person) a license or formal permission *for, to do;* grant formal permission for, authorize (an action or practice)" (emphasis in original).

This definition, however, does not support Plaintiffs' position. The definition merely states that a license grants permission to perform some unspecified "action or practice" without detailing what that action or practice is.[2] It certainly does not imply that in this case, "license" means permission to practice a patent. Instead, the definition is equally consistent with Defendants' view that the license only granted Plaintiffs certain litigation and other non-practice related rights as it is with Plaintiffs' position that it conferred the right to practice.

The Agreements never mention the right to practice. They do, however, specifically grant five other categories of rights immediately after they mention "all substantial rights" in Paragraph 1, including rights related to sublicensing and suits for infringement. (R. 289-9, 289-10.) Plaintiffs cannot explain why the sophisticated parties involved here excluded the right to practice from this list if it was truly part of the parties' bargain. The language in the Agreements explaining that Plaintiffs are "engaged in the business of acquiring and licensing intellectual property rights" further suggests that the Agreements were unconcerned with conveying the right to practice the patents to New Medium and AV. Moreover, and most significantly, the Federal Circuit has explicitly concluded that where an "agreement is . . . silent as to [the licensee's] rights to practice the patent, whether exclusively or otherwise, and focuses instead on [the licensee's] right to license the patent and sue for its infringement," the agreement indicates that "the parties did not envision that [the licensee] would practice the patent." *Propat,* 473 F.3d at 1194. The Court draws the same conclusion here, and as a result,

---

[2] Legal definitions of the word "license" similarly leave the nature of a potentially infringing practice or action open. *See, e.g.,* John Gladstone Mills III, Donald C. Reiley III & Robert C. Highley, *Patent Law Fundamentals* § 19:5 (May 2007 Supp.) ("A license is but a promise by one having an interest in a patent to forbear from suing one who would commit what would be, but for the license, an infringement of that interest").

Plaintiffs do not qualify as "exclusive licensees" as a result of their ability to practice the patents.[3]

### III.  Exclusive Licensee Status – "All Substantial Rights" Factors

Plaintiffs have not yet exhausted the methods by which they can establish standing.  *Propat* holds that even when a case does not fit cleanly into the standard "exclusive licensee versus bare licensee" analysis, such as when a plaintiff does not have the right to practice the patents at issue, a plaintiff may still have standing due to its ownership of other patent rights.  Pursuant to this analysis, courts must examine the various relevant rights discussed in *Propat* to determine whether the specific mix at issue here makes Plaintiffs akin to an "exclusive licensee" or a "bare licensee" for standing purposes.  Because Plaintiffs hold a variety of patent rights that make them much more than "bare licensees," Plaintiffs may maintain their suit if they join the Licensors.

While Plaintiffs' rights and those of the *Propat* plaintiffs are restricted with respect to many of the same components of the "bundle" of patent rights, the restrictions in this case are not as extensive as those in *Propat*.  Plaintiffs' inability to transfer their rights to a party who "infringes or may infringe" is a significant restriction on transferability, as is the Agreements' right of first refusal provision.  Still, Plaintiffs' ability to transfer their rights extends well beyond that of the plaintiffs in *Propat,* where the licensor had the absolute ability to veto any proposed transfer at no cost to itself, even

---

[3] Plaintiffs briefly argue that previous agreements granting patent rights to Pixel and TLC show that Pixel and TLC's grant of "all substantial rights" in the Agreements must have included certain rights related to the right to practice.  (R. 289-1, Opp. to Mot. to Dismiss at 5-6.)  However, as Plaintiffs themselves emphasize, Illinois adheres to a "four corners rule" of contract interpretation, pursuant to which "an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used.  It is not to be changed by extrinsic evidence."  *Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 878 (7th Cir. 2005) (citation omitted).  As a result, the Court will not look to outside contracts to interpret the Agreements at issue here, which detail at great length the rights that they confer.

if it did so "arbitrarily." *See id.* at 1191. With respect to sub-licensing, Plaintiffs'

inability to sub-license to manufacturers of "Components" is a substantial limitation on

their rights. Still, Plaintiffs' ability to freely sub-license to other types of manufacturers

gives them rights well beyond those involved in *Propat,* where the licensee was unable to

sub-license its rights to any third party without the consent of the licensor. *See id.* at

1191. Plaintiffs' ability to bring lawsuits on the patents follows this pattern once again.

The Licensors withheld significant rights when they retained the right to participate in

certain administrative proceedings as well as the right to have Plaintiffs "consult" with

them on all enforcement actions. Still, the rights retained by the Licensors fall well short

of those retained by the licensors in *Propat,* who could veto any of the licensee's targets

for suit. *See id*. Furthermore, unlike in *Propat,* Plaintiffs here are obligated to maintain

the patent, which the Federal Circuit has recognized as an indication of ownership. *See

id.*

Taken together, the rights Plaintiffs received through the Agreements make them

much more than "bare licensees." Plaintiffs' significant litigation, maintenance,

licensing, and transfer rights give them a significant ownership interest in the patents,

providing standing to sue on the patents at issue if they join the Licensors in their suit.

## IV.     Transfer of the '070 Patent

Barco and Miranda assert an additional argument for lack of standing unique to

the '070 patent. They claim that because AV's license on the patent was executed in

2004, after the patent expired, the purported transfer of rights had no legal effect. As a

result, they contend that AV has no standing to sue on the patent.

18

Barco and Miranda's argument fails.  They cite two cases that purportedly stand for the principle that "rights in an expired patent are no longer subject to transfer" (R. 232-1, Mem. in Supp. of Mot. to Dismiss at 14), but they succeed only in citing broad language from each case out of context.  In *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 257 (1945), the Supreme Court stated that "[t]he rights in [an] invention are . . . no longer subject to private barter, sale, or waiver" once a patent expires.  The discussion immediately preceding this statement, however, shows that the Court was concerned only with the right to use an invention following expiration of a patent and did not in any way contemplate the ability of parties to transfer the right to sue for prior infringement.  *See id.* at 256-57.  Similarly, in *Waterloo Furniture Components, Ltd. v. Haworth, Inc.,* 467 F.3d 641, 648 (7th Cir. 2006), the Seventh Circuit stated that "after a patent's expiration there is nothing left for the patent holder to license."  Once again, however, the *Waterloo* court was only concerned with the ability of the public to "make, use or sell the patented invention" after the relevant patent expired, and did not intend to establish a broader legal principle.  *Id.* at 647.  Barco and Miranda have failed to cite any authority directly stating that a holder of patent rights may not license the right to sue for infringement to another party after expiration of the patent.

Indeed, there is no reason to believe that the law would restrict transfer in this manner.  Parties are clearly able to sue for past damages on an expired patent.  *See, e.g., In re Morgan,* 990 F.2d 1230, 1232 (Fed. Cir. 1992); *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1462 (Fed. Cir. 1998).  Barco and Miranda have failed to even suggest why – and more to the point, have failed to cite any authority indicating why – courts would restrict transfer of this right when the individual rights that comprise a patent's "bundle of

rights" are generally freely "divided and assigned, or retained in whole or part." *Vaupel,* 944 F.2d at 875. The only case the parties cite (and of which the Court is aware) that examined the issue before the Court concluded that the "basic premise that the right to sue for past infringement cannot be assigned after a patent has expired contradicts over a century of established patent law." *Valmet Paper Mach., Inc. v. Beloit Corp.,* 868 F. Supp. 1085, 1087 (W.D. Wis. 1994) (citing cases). The Court finds the reasoning of the *Valmet* court persuasive.

Defendants also weakly suggest that it is "not at all clear" that transfer of the right to sue alone provides Plaintiffs with standing to sue for infringement. (R. 334-1, Reply in Supp. of Mot. to Dismiss at 14.) This argument is superficially appealing because as discussed above, the Federal Circuit has stated that a "right to sue" provision on its own will not independently provide a licensee with standing, and courts must examine all rights granted and retained by a license to make a standing determination. *See Textile Prods.,* 134 F.3d at 1485. In this context, however, the right to sue for prior infringement was the only right in play at the time of transfer because the underlying patent itself had already expired. As a result, the license granted AV all available rights in the patent, and the grant of the right to sue alone confers standing. *See Valmet,* 868 F. Supp. at 1087-88 (grant of right to sue alone confers standing when the initial patent owner retains no interest in the patent). The timing of the '070 license does not prevent Plaintiffs from suing on the '070 patent.

## CONCLUSION

Miranda and Barco N.V.'s Joint Motion Under Fed. R. Civ. P. 12(b)(1) to Dismiss for Lack of Standing is denied. Miranda and Barco correctly assert that

Plaintiffs do not have "all substantial rights" in the relevant patents, however, and as a result, Plaintiffs must join the Licensors as plaintiffs to establish standing to sue. One of the Licensors – TLC – is already a Plaintiff in this action. Plaintiffs are instructed to join the remaining Licensors – J. Carl Cooper and Pixel Instruments – by July 19, 2007.

At the end of their reply brief, Defendants request leave to move for sanctions due to Plaintiffs' failure to produce a certain document. Defendants argue that they were misled into briefing an argument that they would have realized was meritless if the document had been properly produced. Defendants do not need leave to file a motion for expenses or sanctions. If Defendants still wish to file such a motion, they should do so in a separate filing.

Dated: July 5, 2007                                    **ENTERED**


**Amy J. St. Eve**

**United States District Court Judge**

21