UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

| | | |
|---|---|---|
| NEW MEDIUM LLC, AV TECHNOLOGIES, LLC, J. CARL COOPER, PIXEL INSTRUMENTS CORPORATION, IP INNOVATION LLC, and TECHNOLOGY LICENSING CORPORATION, | ) ) ) ) ) | No. 05 C 5620 |
| *Plaintiffs*, | ) ) ) | Judge Richard A. Posner |
| v. | ) ) ) ) | Sitting by designation |
| BARCO N.V., and SYNTAX-BRILLIAN CORPORATION, | ) ) ) ) | |
| *Defendants*. | ) | |

---

**MEMORANDUM OPINION**

On September 16, 2008, I conducted a one-day evidentiary hearing on Barco's defense that New Medium engaged in inequitable conduct in for a proceeding to reexamine U.S. Patent No. 5,424,780, *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559–62 (Fed. Cir. 1984); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365–66 (Fed. Cir. 2008), and should therefore be barred from enforcing two patents on which this lawsuit is based. They are the '780 patent itself and U.S. Patent No. 6,529,637, which is closely related to the '780 patent and was the subject of the same kind of reexamination proceeding in which the same expert reports (the basis of the charge of inequitable conduct) were submitted. This opinion contains my findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

The burden of proving inequitable conduct is by clear and convincing evidence, *Praxair, Inc. v. ATMI, Inc.*, 2008 WL 4378391, at *4 (Fed. Cir. Sept. 29, 2008); *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1233–34 (Fed. Cir. 2008), that the "patent applicant breached its duty of candor and good faith to the United States Patent and Trademark Office by failing to disclose material information, or submitting false material information, with an intent to deceive the PTO." *Id*. at 1234. "[B]ecause of the ex parte nature of patent prosecution and the valuable assets accruing from patent rights, the PTO imposes on applicants a 'duty of candor and good faith' to adequately disclose known information that may prove to be important—or 'material'—to the PTO's evaluation process. If the PTO issues a patent after an applicant breaches the duty of good-faith disclosure, the applicant's patent will be susceptible to a future challenge. When the applicant attempts to enforce his or her patent rights against another in a subsequent infringement action, the accused infringer may successfully raise the defense of inequitable conduct, thereby preventing the patent holder from enforcing the patent against the accused infringer." Elizabeth Peters, "Note: Are We Living in a Material World?: An Analysis of the Federal Circuit's Materiality Standard Under the Patent Doctrine of Inequitable Conduct," 93 *Iowa L. Rev.* 1519, 1526 (2008).

Barco makes two charges of inequitable conduct. One has no merit: that New Medium misled the patent examiner by failing to disclose that all four of its outside expert witnesses (the fifth, Mr. Cooper, is an insider—he is the principal of New Medium) had been retained, and therefore paid for their reports. Two of the reports said the author had been retained; the other two did not, though in fact all four had been retained. The omissions were not misleading. The reexamination proceeding before the Patent Office was ex parte. In 1999 Congress passed a law that permits *inter partes* reexamination of the validity of patents applied for after the date of enactment. 35 U.S.C. § 311 *et seq*.; see *Cooper Technologies Co. v. Dudas*, 536 F.3d 1330, 1332 (Fed. Cir. 2008). "The identifying feature of *inter partes* reexamination is that it involves not merely the patent owner and the PTO. In contrast to *ex parte* reexam, a third-party requester participates throughout an *inter partes* case: the requester initiates the proceeding, the patent owner may respond to any office action, and the requester may comment on any response by the owner. In *ex parte* reexam, a non-owner *ex parte* requester's participation ends before the first office action." Joseph D. Cohen, "What's Really Hap-

pening in *Inter Partes* Reexamination," July 1, 2005, www.stoel.com/Files/InterPartes.pdf, p. 3 (visited Oct. 10, 2008). But the patents involved in this proceeding were applied for before the enactment of the new statute. The proceeding was therefore ex parte. And all expert reports in an ex parte proceeding before the Patent Office are procured by the patent owner or applicant, and it is customary to pay the experts for their time, as was done in this case. There is nothing in the reports of the two experts who didn't say they had been retained to suggest they were charging no fee—no suggestion that they had been moved by altruism or a strong conviction of the rightness of the application to volunteer to submit an expert report *gratis*.

The substantial charge of inequitable conduct relates to the statement in Cooper's report that "I have never met or talked with any of these experts [the four experts mentioned above] prior to my contacting them in the last month." The report is dated August 11, 2001, and signed by Cooper underneath the following attestation: "I hereby declare that all statements made herein of my own knowledge are true, that all information made on information and belief are believed to be true, and that all opinions expressed are true in my professional opinion; and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine and imprisonment, or both, under Section 1001 of Title 18 of the United States Code; and that such willful false statements may jeopardize the reexamination and/or validity of the '780 patent under reexamination or any reexamination certificate which may issue."

Cooper's statement that he had not met or talked with any of the experts prior to a month before soliciting expert reports from them was false. He had had email correspondence and possibly one or more phone conversations with one of the experts, Kevin Klughart, beginning on January 15 of that year. That day he had called or emailed Klughart inviting him to bid on a project relating to another litigation in which Cooper was involved (Klughart is both a lawyer and an engineer). Klughart had responded the next day by sending Cooper a draft of a retainer form plus a confidentiality agreement that Cooper had requested. Klughart followed up a month later by sending Cooper a detailed proposal for the project. The proposal stated that the cost of the project would be $250,000. A few days later Klughart billed Cooper $3,000 for preparing the proposal. Cooper paid the bill on March 23 but did not respond to the proposal.

At his deposition Klughart testified that during the preparation of his proposal "there was probably a lot of talking going on," and since the only person he was talking to about the project was Cooper the implication is that there was other contact with Cooper besides what I have mentioned, though Klughart now denies recalling whether there was "a lot of talking going on."

Both he and Cooper testified at the evidentiary hearing. Klughart's testimony was not very helpful because he remembered so little about his dealings with Cooper, although that is understandable because they occurred more than seven years ago and Klughart has no records of those dealings. (Cooper's records are also scanty.) In addition, I learn from Cooper's post-hearing brief that Cooper anticipated calling Klughart as an expert witness in this lawsuit. (I learn this because the brief suggests that if I find inequitable conduct, I bar Cooper and Klughart from testifying, rather than void the patents.) I conclude that Klughart is not neutral and that his forgetfulness may be strategic.

Klughart testified in the evidentiary hearing that I conducted that he receives no response to 80 percent of his proposals and therefore was not surprised not to hear back from Cooper about his proposal for the $250,000 project. (He also testified that it is customary to submit a bill with the proposal, if the proposal was solicited, as it was in this instance.) He assumed that Cooper had thought the price tag too high. He testified that although his proposal had contained a statement that the offer was good for only 30 days, this did not mean that the proposal lapsed after that period (as New Medium argues) but only that the price was not guaranteed beyond then since the underlying costs on which it was based might change over a longer period.

When Cooper called Klughart in July to ask him to do a report for the patent proceeding, Klughart was surprised, given that Cooper had not gotten back to him about the proposal. It turns out that Cooper had given the project for which he had solicited a proposal from Klughart to a company called ChipWorks, to which Klughart had said in his proposal he would subcontract some of the work if his proposal was accepted.

Cooper testified that when he submitted his report in August of 2001 he had forgotten his prior dealings with Klughart. I do not believe that testimony. This is not because I would expect Cooper to remember every proposal that he had solicited, received, and tabled or rejected within the previous seven months, but because I would expect his memory to be jogged when he talked to Klughart

about submitting an expert report, even if Klughart did not mention their previous dealings. (Klughart testified that he didn't remember whether he had mentioned them or not.) The name "Kevin Klughart" is uncommon. (A Google search turns up no Kevin Klugharts other than the one involved in this case.) In his first letter to Cooper, the name "The Patent Engineer" appears on the letterhead as if it were a firm name; his name is printed above his signature. There is no evidence that he is widely known by the firm name "The Patent Engineer." (The letterhead of his bill to Cooper says "Klughart Engineering, Inc./The Patent Engineer.") Since it was and is a one-man firm, whether called "The Patent Engineer" or "Klughart Engineering, Inc.," it is most unlikely that it has any reputation separate from that of Klughart. I conclude that Cooper had heard of him by name before he sent him the request for a proposal in January 2001, although he testified that he could not remember how he had first learned about Klughart.

Cooper must also have had *some* reason for asking him in July to prepare an expert report for the patent proceeding, although he testified that he did not remember why he had asked Klughart. (The faulty memories of key witnesses bears on a separate issue in this case, which I do not address in this opinion—whether some of New Medium's claims should be dismissed on the ground of laches.) In between was the payment of Klughart's bill for $3,000 in March. Cooper testified that he never saw the bill—that his wife takes care of all his bills. I don't believe that testimony either. The bill is complex and technical, and Cooper's wife, though she does the bookkeeping for her husband, is not a patent specialist; she could not know whether the amount was correct or indeed whether the bill was payable, without consulting her husband. I do not believe that she would have taken it on herself to pay such a bill without showing it to him or at least asking him about it. She did not testify, which enhances my skepticism. Of course I cannot be certain that she would not have paid Klughart's bill without consulting her husband, but it is my duty as the trier of fact on the issue of inequitable conduct to determine issues of credibility as best I can.

The choice of Klughart to submit an expert report was unexpected and gives rise to additional doubts about Cooper's testimony. Although Klughart has academic credentials in law and engineering that qualify him to prepare such a report for submission to the Patent Office, he is not a prominent member of the patent bar or patent community. He is a solo practitioner in Denton, Texas, a modest-sized city (population about 80,000). He has no staff, not even a secre-

tary; and his annual income is modest—about $130,000 to $150,000 in 2001 (and that was before he moved from Dallas to Denton and as a result of that move experienced a decline in his practice). Never before (or, for that matter, since) had he been asked to submit an expert report to the Patent Office. It is *exceedingly* unlikely that Cooper would have asked him for such a report had he not remembered his previous dealings with him, which included, to repeat, the initial solicitation of a proposal, the receipt first of the retainer and confidentiality agreements, then of the proposal, "a lot of talking going on," and then the bill, and finally the payment of the bill. I think it also highly likely that knowing that Klughart had wanted to do business with him Cooper expected that Klughart's report would strongly favor Cooper's position in the reexamination proceeding. Cooper's brief twice describes Klughart unflatteringly as "a hired gun." The brief further disparages him, in an effort to refute the materiality of Cooper's misrepresentation to the patent examiner, by stating that the examiner must have disregarded Klughart's declaration because it had the same defects as Cooper's initial effort in the reexamination proceeding—the effort the examiner had found unpersuasive—to distinguish the invention disclosed in another patent, which the parties call the Shinya patent, from the invention in Cooper's patent. This suggests that Cooper's counsel knowingly submitted to the Patent Office a declaration that did not support his client's position.

I am also disturbed by the statement in Cooper's brief that "Mr. Cooper didn't think his past contact with Dr. Klughart was 'material' and that's why he didn't disclose it." That is an admission that Cooper lied in his declaration, though I imagine it is unintended.

The reexamination proceeding was critical for Cooper. He was embroiled in litigation in California over patent '780. Evidence presented in that proceeding suggested that it might be invalid because anticipated by the Shinya patent, prior art that had not been brought to the attention of the Patent Office in the proceeding that had led to the grant of the '780. It was to counter the effect of such evidence that Cooper instituted a reexamination proceeding in the Patent Office. 35 U.S.C. § 302; *Patlex Corp. v. Mossinghoff*, 758 F.2d 594 (Fed. Cir. 1985). The purpose of such a proceeding is to "enable[] the PTO to recover administrative jurisdiction over an issued patent in order to remedy any defects in the examination which that agency had initially conducted and which led to the grant of the patent." *Id*. at 601. Cooper's hope was to obtain a ruling by the patent examiner

that the Shinya patent did not invalidate the '780 patent. "It is clearly appropriate that the jury be instructed that because the PTO has now held the claims in suit patentable in light of the additional art discovered [by the defendant], its burden of proof of unpatentability has become more difficult to sustain—a fact likewise to be taken into account by the trial judge." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1354 (Fed. Cir. 1984). In most cases the reexamination proceeding is instituted by the alleged infringer, who hopes the Patent Office will find the patent invalid on the basis of newly presented prior art, but in this case it was the patentee, hoping to strengthen his case by obtaining a favorable ruling concerning the prior art being pressed by the alleged infringer. Steven M. Auvil, Note, "Staying Patent Validity Litigation Pending Reexamination: When Should Courts Endeavor to Do So?" 41 *Cleveland St. L. Rev.* 315, 322 (1993).

The patent examiner's initial response to Cooper was negative; he said that Cooper's submission was not persuasive. It was at that point that Cooper retained the experts, including Klughart, to submit reports that would dispel the examiner's skepticism. It was extremely important to Cooper that he get strongly supportive reports from as many experts as possible. He testified at the evidentiary hearing that he wanted the examiner to believe "that the wording of 'resolution' and 'apparent resolution' was well-known to the person of ordinary skill in the art at the time of my invention." He had failed to persuade the patent examiner. It was fourth down. He needed a surge of power and sought it in reports from multiple independent experts, one of whom was not independent.

He could not or would not explain at the evidentiary hearing how he had picked Klughart to be one of his experts. He testified that he thought the name had been suggested to him by someone (he said he didn't remember whom), but since Klughart had never before submitted an expert declaration to the PTO I can't imagine who would have recommended him to prepare such a declaration, except, in light of their previous relationship, Cooper himself.

I conclude that the statement in his report that he had not talked to any of the experts prior to a month before was a deliberate fabrication.

Two questions remain: whether the fabrication was material, and whether declaring the patents unenforceable is a properly proportioned sanction. The questions are related. If it was immaterial, still, being a fabrication (and not the harmless sort—harmless at least in a patent proceeding—as when a man lies about his age to impress a young woman), it might warrant discipline by the

Patent Office. (Cooper, as a registered patent agent, is subject to such discipline.) It would also be impeachment material in future testimony by Cooper. But it would not warrant invalidating the patents. *Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*, 468 F.3d 1366, 1374–78 (Fed. Cir. 2006); *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1571 (Fed. Cir. 1997); *Molins PLC v. Textron*, 48 F.3d 1172, 1178 (Fed Cir 1995).

　　Clearly the fabrication was material. It bore centrally on the credibility of one of the expert reports. *Ferring B.V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1187 (Fed. Cir. 2006) ("we have previously held that a declarant's prior relationships with the patent applicant may be material, and that failure to disclose such relationships to the examiner may constitute inequitable conduct"); *Refac Int'l v. Lotus Development Corp.*, 81 F.3d 1576, 1583–84 (Fed. Cir. 1996); *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 901 (N.D. Ill. 2006). Suppose Cooper had explained the circumstances to the patent examiner—that Klughart, a practitioner of modest means and prospects, had submitted to Cooper a $250,000 proposal that Klughart may at the time he prepared his expert report have thought he still had a chance of winning; Cooper had not responded to his proposal and Klughart was unaware that the project had been awarded to someone else. Klughart testified that the $250,000 proposal would have netted him about $200,000—a good deal more than a year's income for him. Of course the project would have taken time that Klughart might otherwise have earned on other projects, but it is highly unlikely that it would have taken so much time as not to produce a big boost in his income. Furthermore, Cooper, with his extensive litigation activity, represented a very valuable potential contact for Klughart, who is a patent lawyer and an engineer. Just the fact that Cooper apparently intended to use Klughart as an expert witness in this litigation suggests the potential value of such a contact for Klughart.

　　Had these circumstances been disclosed to the patent examiner in Cooper's declaration, Klughart's report would have been rejected and perhaps the other reports as well, contaminated by the evidence of Cooper's bad judgment in soliciting a report from Klughart. Therefore, had Cooper been committed to telling the sorry truth to the patent examiner, he would not have submitted Klughart's report in the first place. Cooper might have found an equally persuasive substitute, but there is no evidence of that. And he might have won his case with only three expert reports (besides his own, of course), but there is no evidence of that

either. "An inventor cannot submit a misleading affidavit among a plurality of affidavits and later argue that it was the nonmisleading affidavit that resulted in allowance, thus effectively curing the defective affidavit." *Refac Int'l v. Lotus Development Corp.*, *supra*, 81 F.3d at 1584. The patent examiner never said or implied that he would have given the same weight to a smaller number of affidavits.

Once a "threshold level" of materiality is shown, the court proceeds to the ultimate question—whether the patentee's conduct should be deemed inequitable. *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309 (Fed. Cir. 2006). I conclude that it should be. The making of a deliberate, material misrepresentation to a patent examiner is extremely serious misconduct because of the ex parte nature of most patent proceedings, including the reexamination proceeding at issue in this case. *Ferring B.V. v. Barr Laboratories, Inc.*, *supra*, 437 F.3d at 1187; *Norton v. Curtiss*, 433 F.2d 779, 793–94 (Court of Customs and Patent Appeals 1970); *CTS Corp. v. Electro Materials Corp.*, 469 F. Supp. 801, 823 (S.D.N.Y. 1979). There is no opportunity to smoke out the truth through cross-examination of witnesses (such as the experts who submitted reports in Cooper's reexamination proceeding) or through testimony by witnesses adverse to the applicant. The truth is likely to come out only if there is litigation, which in most cases there will not be. In most cases the patentee will settle any dispute with a potential infringer by negotiating a patent-licensee fee, as illustrated by this case, in which seven of the original nine defendants have settled. "Clearly, [the Patent Office] must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential." *Norton v. Curtiss*, *supra*, 433 F.2d at 794.

Because even material misrepresentations made to the Patent Office will usually not be detected, it is necessary to impose a severe sanction for such misrepresentations when they are detected, at least when as in this case they are deliberate. The appropriate sanction will normally be, and in this case I have decided that it should be, the cancellation of the patents. The alternatives suggested by Cooper are unsatisfactory. One is barring him and Klughart from testifying. Having been compromised by his involvement in the inequitable conduct, Klughart would never be called as a witness by Cooper. Even more clearly, a

finding of inequitable conduct would make Cooper a highly vulnerable witness; if he is called as a witness, it will be by Barco rather than by New Medium.

  The other alternative New Medium suggests, while a good deal more sensible, is barred by Federal Circuit precedent that both parties manage to ignore. (Despite the substantial financial stakes in this litigation, the briefing by both parties leaves a good deal to be desired.) The suggestion is that since the expert reports pertained to only a fraction of the claims in the '780 patent, I should declare unenforceable just those claims. The Federal Circuit has repeatedly ruled that if inequitable conduct is proved, the entire patent is unenforceable and not just the claims affected by that conduct. *Praxair, Inc. v. ATMI, Inc., supra*, at *12; *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988); *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1561 (Fed. Cir. 1984).

  U.S. Patents Nos. 5,424,780 and 6,529,637 are hereby declared unenforceable.

So Ordered.

*Richard A. Posner*<br>
United States Circuit Judge,<br>
Sitting by designation

October 16, 2008